## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NICHOLAS PAUL MILLER,** *et al.*, | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO.  23-3992** |
| | : | |
| **COUNTY OF CHESTER,** *et al.*, | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                                     **January 19, 2024**

Plaintiffs Nicholas Paul Miller and Matthew Davis ("Plaintiffs"), pretrial detainees housed at the Chester County Prison ("CCP"), filed a pro se civil rights complaint pursuant to 42 U.S.C. § 1983, asserting violations of their constitutional rights arising from the conditions of their confinement at CCP.  Currently before the Court are Plaintiffs' Complaint ("Compl." (DI 2)), their separate motions for leave to proceed in forma pauperis (DI 1, 6), and their Prisoner Trust Fund Account Statements (DI 3, 7).  Plaintiffs assert claims against the following Defendants: Chester County, the Chester County Health Department, the Chester County District Attorney's Office,[1] CCP, the CCP Maintenance Department, current CCP Warden Holland, former CCP Warden Phillips, CCP Director Mulrooney,[2] CCP Captain Hamb, CCP Q-Block Serg. Sauer, CCP Q-Block John/Jane Doe Correctional Officers on duty May 19, 2023 through

---

[1] Counsel has filed an entry of appearance on behalf of the Chester County District Attorney's Office and a Motion to Dismiss Plaintiffs' claims against that Defendant.  (DI 11, 10.) For the reasons set forth herein, the motion will be denied as moot.

[2] There are no factual allegations in the Complaint describing any conduct engaged in by Mulrooney and for this reason the claims against him will be dismissed, albeit without prejudice. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.).

September 20, 2023, and CCP F-Block John/Jane Doe Correctional Officers on duty from May 19, 2023 through September 20, 2023.[3]  (Compl. at 3, 4, 6-7.)[4]   All Defendants are sued in their "Professional Capacities."[5]  (*Id*. at 6-7.)   For the following reasons, the Court will grant Mr. Miller and Mr. Davis leave to proceed in forma pauperis and dismiss with prejudice their claims against CCP, its Maintenance Department, the Chester County Health Department, and the Chester County District Attorneys' Office.  Plaintiffs' individual capacity asserting violations of the Americans with Disabilities Act will also be dismissed with prejudice.  Plaintiffs' official

---

[3] Included in Plaintiffs' Complaint a list of individuals described as, "The List of CCP & PrimeCare, Inc. Employees."  (Compl. at 17.)  Many of the individuals identified are not listed as Defendants in the caption of the Complaint or on the list that purports to supplement the Complaint form's section for identification of Defendants.  (*See id*. at 6-7.)  It is not clear whether Plaintiffs intend to pursue claims against these other parties.  Upon amendment, Plaintiffs will have an opportunity to clarify their intentions in this regard.

[4] The Court adopts the pagination supplied by the CM/ECF docketing system.

[5] Plaintiffs checked boxes on their form Complaint indicating that they were asserting their claims against CCP, Chester County, Chester County Health Department, and the Chester County District Attorney's Office in their official capacities.  (Compl. at 2, 8.)  On the handwritten sheets listing the remaining Defendants, Plaintiffs included the phrase "Prof Capacity," which the Court understands to mean official capacity, in each entry.  (*Id*. at 6, 7.)  Plaintiffs appear not to have understood the implications of asserting their claims against the Defendants in their official capacity only.  Official capacity claims against municipal employees such as the named individual Defendants are indistinguishable from claims against the governmental entity that employs the Defendant, here Chester County.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978).  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.*  The Court will liberally construe the Complaint to assert claims against the individual Defendants in their individual capacities as well.  *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020) ("To determine whether a plaintiff sued state officials in their official capacity, we first look to the complaints and the course of proceedings." (quotations omitted)); *Coward v. City of Philadelphia*, No. 21-1619, 2021 WL 4169422, at *3 (E.D. Pa. Sept. 13, 2021) (permitting claim against defendant in his individual capacity to proceed even though "[plaintiff] did not check the box indicating a desire to sue [that defendant] in his individual capacity" where the allegations clearly sought relief based on the defendant's conduct).

capacity civil rights claims against the individual Defendants will be dismissed as duplicative of the claims against Chester County.  Plaintiffs' remaining claims will be dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiffs will be granted leave to file an amended complaint.

## I.  FACTUAL ALLEGATIONS[6]

The gravamen of Plaintiffs' claims is that from May 19, 2023 through September 24, 2023, they were exposed to black mold at CCP, informed prison personnel and others orally and in writing about the problem, and the prison's efforts to ameliorate the problem was inadequate. To state their claims, Plaintiffs completed the Court's prisoner civil rights form Complaint and supplemented it with handwritten pages.  (*See* Compl.)  The first set of handwritten pages describing the events giving rise to Plaintiffs' claims is presented journal style and is written in the first person but does not identify which plaintiff wrote the entries.  (*Id*. at 9-18.)  The second set is presented in the form of a signed Affidavit provided by Nicholas Miller.  (*Id*. at 21-24.) While the first section does not identify the drafter, since it is in a different handwriting than Mr. Miller's portion, construing the Complaint liberally, the Court will presume for purposes of statutory screening that the first set of handwritten pages is a narrative written by Matthew Davis.

### A.  Mr. Davis's Allegations

On June 27, 2023, Mr. Davis smelled mold on Q-Block.  (*Id*. at 9.)  Over the next week, Mr. Davis thoroughly cleaned the cell with bleach and other chemicals, but the smell remained. (*Id*.)  On July 6, Mr. Davis alleges that he exchanged his used sheets for clean ones and noticed a

---

[6] The factual allegations set forth in this Memorandum are taken from Plaintiffs' Complaint (DI 2).

two-by-two-foot patch of black spots on the underside of his mattress.  (*Id*.)  Mr. Davis informed

Block Officer Kennedy that he had been sleeping on a mattress with black mold on it and that he

had asthma.  Block Officer Kennedy replied that there was nothing he could do, but Mr. Davis

should submit a request to the Block Supervisor.  (*Id*.)  Mr. Davis did so.  (*Id*.)

Mr. Davis alleges that the next day, he informed the (unnamed) Q-Block Officer that he

had black mold on his mattress and that he had asthma.  (*Id*.)  The Officer replied that he had

heard that the Maintenance Department was ordering new mattresses for the entire jail.  (*Id*.)

The same day, Mr. Davis sent a written request to Captain Maznack asking to switch cells or

exchange his mattress for a clean one in light of his asthma and heart problems.  He also asked

that the vents in his cell be cleaned.  (*Id*. at 10.)  Mr. Davis received no response to the request.

On July 10, Mr. Davis alleges that he unsuccessfully requested that the Block Officer call

the Medical Department so that he could receive a breathing treatment.  (*Id*.)  He further alleges

that he had experienced chest pains, headaches, and dizziness for ten days by that point.  (*Id*.)

On July 12, Defendant Ham (sometimes spelled "Hamb") and Sauer (sometimes spelled "Secar")

inspected Mr. Davis's mattress, whereupon Defendant Ham remarked that the mold problem was

bad and that he would speak to Maintenance about replacing the mattress immediately.  (*Id*.)  He

also instructed Defendant Sauer to call Maintenance.  (*Id*.)  Later that day, Defendant Sauer

returned to Mr. Davis's cell and informed Mr. Davis that Maintenance had been contacted but

that he would need to be patient as replacing the mattress would take at least a month.  (*Id*. at

11.)

On July 13, Correctional Officer Stuart asked Mr. Davis if he had black mold on his

mattress, asked to see it, then wrote down Mr. Davis's name.  (*Id*.)  Later that day, Mr. Davis

followed up on a request for a grievance form to which he had received no response and was told

that there was a "Grievance Box" on the quad where forms were available.  (*Id.*)  Mr. Davis

alleges that the available forms are styled "Complaint" not "Grievance" and that to the extent

there is a new grievance procedure it was not explained to him.  (*Id.* at 12.)

On July 14, a non-defendant named Sergeant Diori called Mr. Davis to the "bubble" on

Q-Block and aggressively asked Mr. Davis about his grievance.  (*Id.* at 12-13.)  He then told Mr.

Davis, "This is not a f***ing grievable issue, what's your problem," tore up Mr. Davis's

grievance and threw it in the trash.  (*Id.* at 13.)  Sergeant Diori then told Mr. Davis to complete a

grievance form while Sergeant Diori waited.  Mr. Davis did so and upon handing the completed

grievance to Sergeant Diori, Sergeant Diori  repeated that the issue (black mold on Mr. Davis's

mattress and in his cell) was not grievable, tore up the grievance form, and threw it in the trash.

(*Id.*)

On July 15, Mr. Davis submitted a grievance describing the black mold on his mattress

and was told by an unidentified person that if he refused to continue sleeping on the mattress in

his cell, he would be sent to the "hole."  (*Id.* at 13-14.)  Mr. Davis alleges that later that day he

was refused a breathing treatment by an unnamed Medical Assistant, who told him that his blood

oxygen level was 97% and that she heard no wheezing.  (*Id.* at 14.)  Mr. Davis responded that his

lungs hurt and that he had been exposed to black mold, but the Medical Assistant responded only

that his claim sounded like a dangerous situation but that she had no control over it.  (*Id.*)

Mr. Davis alleges that over the next several days, he continued to smell mold in his cell

and experienced sore lungs, itchy throat, dizziness and disorientation, and returned to the

Medical Department for chest pains and a breathing treatment.  (*Id.* at 14.)  On July 18, Mr.

Davis was brought to the Medical Department, where he saw Captain Maznack and told him that

he had received no response to his complaints and requests regarding the black mold in his cell

and on his mattress. (*Id*. at 14-15.) Captain Maznack responded that it was unacceptable that Mr. Davis had been waiting for a response for nearly a month and that he would handle the problem immediately. (*Id*. at 15.) He also remarked, "Man, that s**t's dangerous." (*Id*.) Mr. Davis alleges that during the July 18 visit to the Medical Department, a physician's assistant repeated that black mold is dangerous and could affect Mr. Davis's asthma and cause lung infections. (*Id*.)

Mr. Davis alleges that the next evening, he was taken to Chester County Hospital because of chest pains. (*Id*.) He received blood work and an EKG, but hospital personnel were not able to determine the cause of the problem. (*Id*. at 15-16.) Mr. Davis was returned to CCP where he remained on the medical block for observation for two days, after which he was returned to his original cell. (*Id*. at 15-16.)

Mr. Davis alleges that on July 21, he submitted another grievance about the black mold. (*Id*. at 16.) He alleges that on July 22, he experienced itchy throat and eyes, chest pains, difficulty breathing, dizziness, insomnia, anxiety, and disorientation. (*Id*.) Later that day, an unnamed Correctional Officer came to Mr. Davis's cell and asked if he had black mold on his mattress. (*Id*.) Mr. Davis replied yes and was told to take a different mattress from an empty cell on the block. (*Id*.) Mr. Davis alleges that one of the mattresses in the cell also had black mold on it, and that the unnamed Correctional Officer instructed Mr. Davis to take that mattress and the moldy mattress from his cell to the Sally-Port. (*Id*. at 16-17.) Mr. Davis did so but secured a large piece of his moldy mattress for his "records." (*Id*. at 17.)

Mr. Davis alleges that on September 11, he was transferred to F-Block and upon arriving at the new cell discovered that the mattress had black mold on it. (*Id*. at 18.) Mr. Davis informed the Correctional Officer on the Block and was provided with a clean mattress

immediately.  (*Id*. at 18.)  Mr. Davis alleges that, as of September 25, he has not received a response to his grievance and is unaware of the outcome.  (*Id*.)

B.       **Mr. Miller's Allegations**

Mr. Miller sets forth his allegations in a signed Affidavit.[7] (*Id*. at 21-24.)  Mr. Miller asserts that the culture at CCP improved during the period from May 19, 2023 through October 7, 2023, which he attributes to Defendant Holland's assumption of the position as Warden.  (*Id*. at 21.)  Mr. Miller nonetheless alleges that during the time he has been detained at CCP, he experienced first-hand the administration's "failed, understaffed, poorly enforced safety and health Policy."  (*Id*.)  Mr. Miller alleges that black mold has been allowed to develop throughout CCP, notwithstanding the danger associated with it.  (*Id*. at 21-22.)  He alleges that he and Mr. Davis individually both spoke with and wrote to prison personnel and outside agencies persistently about the situation.  (*Id*. at 22.)  He alleges, however, that he has spent six months living in what he describes as toxic conditions that endanger both inmates and staff.  (Id.)

Mr. Miller admits that he does not know whether black mold spores will have an adverse effect on his health in the future.  (*Id*.)  He references the recent COVID protocols and questions why there is currently an issue with air-borne pathogens at CCP and why the vent and moisture removal systems are in their current (undescribed) conditions.  (*Id*.)  He asserts that the "old guard['s] personnel and maintenance policy" has shown deliberate indifference to the condition of these systems and describes CCP as "an unsupervised basement where no governing body performs any double checks, outside of reports, facts, and findings."  (*Id*. at 22-23.)

---

[7] The Court notes that the document is signed by both Mr. Miller and Mr. Davis, and the Court will, therefore, attribute the allegations therein to both Plaintiffs.  (*Id*. at 24.)

7

Mr. Miller alleges that the prison administration has been able to maintain ignorance of the black mold conditions because of the "filtered" grievance process and policy in place during the relevant time.  (*Id*. at 23.)  He asserts that the administration has engaged in deliberate indifference to the long-term health benefits of both inmates and staff.  (*Id*.)  Mr. Miller alleges that the new administration has acknowledged the black mold problem and have begun efforts to clear it.  (*Id*. at 23-24.)  These efforts, however, have been unsuccessful and have merely spread more mold into the air, because of the prison personnel's inexperience with addressing mold infestations and a lack of processes and policies governing the treatment of mold.  (*Id*. at 23-24.)  Mr. Miller asserts that the failed policies of the previous administration reflect historical indifference to maintenance of the facility and safety of the staff and inmates.  (*Id*. at 24.)

Mr. Miller requests that the Court find CCP and Chester County liable for failed policies that continue to put lives at risk.  (*Id*. at 23.)  He asks that the Court award damages to him and to Mr. Davis for services rendered and hardships endured.  (*Id*.)  He also requests that CCP's in-house processes and procedures be evaluated and that the facility be brought into compliance with its (undescribed) documentation.  (*Id*.)  He also requests that OSHA (presumably the Occupational Health and Safety Administration) assess CCP's conditions, policies and practices and report its findings to the Court.  (*Id*.)

Jointly, Plaintiffs allege that Mr. Miller sent written notice of the mold issue to the Chester County Health Department, the Chester County District Attorney's Office, and Chester County.  (*Id*. at 20.)  They further allege that their claims arise from CCP's grievance system, the failure of the CCP Maintenance Department and staff to know about or have a mold removal process, and the deliberate indifference of CCP to the potential for harm because of exposure to black mold.  (*Id*.)

Plaintiffs assert claims for deliberate indifference, for violations of their Eighth and Fourteenth Amendment rights, and for violations of the ADA, 42 U.S.C. § 12101, *et seq*. (*Id*. at 8.) The "Injuries" section of the form Complaint lists auditory hallucinations, depression, weight gain and breathing issues, and hospitalization, presumably as a result of exposure to black mold. (*Id*. at 25.) This section does not identify which Plaintiff experienced these injuries. Plaintiffs request injunctive relief and money damages. (*Id*.)

Included with Plaintiffs' Complaint is a handwritten document titled "Affidavit" that appears to have been signed by a non-party named Jacob Fulton. The document states that Mr. Fulton was provided with a mattress with black mold on it when he arrived at intake on N-Block on February 22, 2023. (*Id*. at 19.) The document further states that when Mr. Fulton requested a new mattress, he was told, "[n]ot gonna happen." (*Id*.) When Mr. Fulton was placed in the general population, he was again provided with a mattress with black mold on it but was allowed to switch it for a clean one. (*Id*.) When Mr. Fulton was later placed in Restricted Housing for a month beginning in June 2023, he noted that all cells had mats with black mold on them. (*Id*.) The purpose of this document is unclear.

## II.    STANDARD OF REVIEW

The Court will grant Mr. Miller and Mr. Davis leave to proceed in forma pauperis because it appears that they are incapable of paying the fees to commence this civil action.[8] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed

---

[8] However, as Plaintiffs are prisoners, they will each be obligated to pay the full filing fee in installments in accordance with the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b). *See Hagan v. Rogers*, 570 F.3d 146, 155 (3d Cir. 2009).

by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  "At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the pro se] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'" *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)).  Conclusory allegations do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As Plaintiffs are proceeding pro se, the Court construes their allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

Moreover, a complaint may be dismissed for failing to comply with Federal Rule of Civil Procedure 8. *Garrett v. Wexford Health*, 938 F.3d 69, 91 (3d Cir. 2019).  To conform to Rule 8, a pleading must contain a short and plain statement showing that the plaintiff is entitled to relief. *See Travaline v. U.S. Supreme Court*, 424 F. App'x 78, 79 (3d Cir. 2011).  The Third Circuit recently explained that in determining whether a pleading meets Rule 8's "plain" statement requirement, the Court should "ask whether, liberally construed, a pleading 'identifies discrete defendants and the actions taken by these defendants' in regard to the plaintiff's claims." *Garrett*, 938 F.3d at 93 (citation omitted).  A pleading may still satisfy the "plain" statement requirement "even if it is vague, repetitious, or contains extraneous information" and "even if it does not include every name, date, and location of the incidents at issue." *Id.* at 93-94.  The

important consideration for the Court is whether, "a pro se complaint's language . . . presents cognizable legal claims to which a defendant can respond on the merits." *Id.* at 94.

However, "a pleading that is so 'vague or ambiguous' that a defendant cannot reasonably be expected to respond to it will not satisfy Rule 8." *Id.* at 93; *see also Fabian v. St. Mary's Med. Ctr.*, No. 16-4741, 2017 WL 3494219, at *3 (E.D. Pa. Aug. 11, 2017) ("Federal Rule of Civil Procedure 8 requires that pleadings provide enough information to put a defendant on sufficient notice to prepare their defense and also ensure that the Court is sufficiently informed to determine the issue.") (quotations omitted).  Dismissals under Rule 8 are "'reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'"  *Garrett*, 938 F.3d at 94 (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)).  In this case, the Defendants cannot meaningfully respond to Mr. Miller's conditions of confinement claims because he does not provide sufficient factual allegations to permit the Defendants to understand the nature and basis of the claims against them.  *See Afzal v. N.J. Bd. of Med. Exam'rs*, No. 22-1609, 2022 WL 4533826, at *3 (3d Cir. Sept. 28, 2022) (affirming dismissal of complaint pursuant to Rule 8 because plaintiff failed to plead adequate factual content to support a reasonable inference that defendants were liable and failed to present cognizable legal claims to which defendants could respond on the merits).

## III.    DISCUSSION

Plaintiffs assert constitutional claims based on violations of their constitutional rights arising from the longstanding presence of black mold at CCP and ineffective efforts to remove it. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

"A defendant in a civil rights action must have personal involvement in the alleged wrongs" to

be liable. *See Rode*, 845 F.2d at 1207; *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020)

("Personal involvement requires particular 'allegations of personal direction or of actual

knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)). *See Iqbal*, 556 U.S. at 676

(explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must

plead that each Government-official defendant, through the official's own individual actions, has

violated the Constitution").

### A.   Claims Against Chester County Prison and its Maintenance Department

The § 1983 claim against Chester County Prison is not plausible because a prison is not a

"person" under Section 1983. *Cephas v. George W. Hill Corr. Facility*, No. 09-6014, 2010 WL

2854149, at *1 (E.D. Pa. July 20, 2010); *Miller v. Curran-Fromhold Corr. Facility*, No. 13-7680,

2014 WL 4055846, at *2 (E.D. Pa. Aug. 13, 2014) (citing *Mitchell v. Chester Cty. Farms Prison*,

426 F. Supp. 271 (E.D. Pa. 1976). Similarly, the prison's Maintenance Department appears to be

a department of CCP and therefore not a "person" subject to suit under 1983. *See Hall-Wadley*

*v. Maint. Dep't*, No. 19-193, ECF No. 5 (dismissing as frivolous claims against CCP's

Maintenance Department and citing *Collins v. S. Central Reg'l Jail*, No. 16-08015, 2018 WL

3550112 (S.D. W. Va. June 25, 2018) (noting that a regional jail's maintenance department was

not a person under § 1983), *report and recommendation adopted*, 2018 WL 3543080 (S.D. W.

Va. Jul. 23, 2018)). The claims against these Defendants will be dismissed with prejudice.

### B.   Claims Against Chester County District Attorney's Office

The claims against the Chester County District Attorney's Office must be dismissed with

prejudice because the United States Court of Appeals for the Third Circuit has held that district

attorney's offices in Pennsylvania are not entities subject to suit under § 1983. *See Reitz v. County. of Bucks*, 125 F.3d 139, 148 (3d Cir. 1997) (holding that "the Bucks County District Attorney's Office is not an entity for purposes of § 1983 liability"); *see also Briggs v. Moore*, 251 F. App'x 77, 79 (3d Cir. 2007) (*per curiam*) ("[T]he Monmouth County Prosecutor's Office is not a separate entity that can be sued under § 1983."). Even if the Chester County District Attorney's Office was an entity liable under § 1983, the Plaintiffs have failed to allege that entity was involved in the mold problem at CCP. The claims against this Defendant will be dismissed with prejudice.

### C.  Civil Rights Claims Against Chester County

#### 1.  Claims Against the Chester County Health Department

Claims against a county agency like the Chester County Health Department are treated as claims against the county itself. *Kane v. Chester Cty. Dep't of Child., Youth & Fams.*, 10 F. Supp. 3d 671, 686 (E.D. Pa. 2014) (concluding that the Chester County Department of Children, Youth and Families is not a legal entity separate from the County of Chester and evaluating claims as if brought against the County itself). *See* https://www.chesco.org/8/Departments (Chester County official website listing Health Department as county office) (last accessed January 16, 2024). "Pennsylvania county offices . . . are treated as municipalities for purposes of *Monell* [*v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978).]" *Hatfield v. Berube*, 714 F. App'x. 99, 102 n.1 (3d Cir. 2017) (citing *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013)). The claims against the Chester County Health Department will be dismissed with prejudice as duplicative of the claims against Chester County.

#### 2.  Official Capacity Claims Against Employees of Chester County

13

As noted, Plaintiffs indicated in their Complaint that they were asserting claims against the individual Defendants in their official capacities.  (*See* Compl. at 6, 7.)  These official capacity claims are indistinguishable from claims against the municipality at issue, here, Chester County.  *See Graham*, 473 U.S. at 165-66 ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell*, 436 U.S. at 690, n. 55).  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.*  To the extent the named Defendants are sued in their official capacities, any such claims are dismissed as duplicative of the claims against Chester County.  *See Stanek v. St. Charles Cty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) ("The district court correctly dismissed these defendants in their official capacity because the Staneks also sued the District."); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); *see also Graham*, 473 U.S. at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

### 3.     Claims Against Chester County

Plaintiffs assert claims against Chester County.  Local governments can be liable as "persons" under § 1983, however, this liability extends only to "their *own* illegal acts."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)); *see Monell*, 436 U.S. at 665-83.  This limitation is based on the well-established principle that municipalities "are not vicariously liable under § 1983 for their employees' actions."  *Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 691 ("[A] municipality

14

cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality

cannot be held liable under § 1983 on a respondeat superior theory.").

Rather, to plead a basis for liability against a municipal entity such as Chester County

under § 1983, a plaintiff must allege that the municipality's policy or custom caused the violation

of his constitutional rights.  *See Monell*, 436 U.S. at 69.  "To satisfy the pleading standard, [the

plaintiff] must . . . specify what exactly that custom or policy was."  *McTernan v. City of York,*

*Pa.*, 564 F.3d 636, 658 (3d Cir. 2009).  "'Policy is made when a decisionmaker possess[ing] final

authority to establish municipal policy with respect to the action issues an official proclamation,

policy, or edict.'"  *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).  "'Custom, on the other

hand, can be proven by showing that a given course of conduct, although not specifically

endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'"

*Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).  For a custom to be the

proximate cause of an injury, a plaintiff must establish that the Defendant "had knowledge of

similar unlawful conduct in the past, failed to take precautions against future violations, and that

its failure, at least in part, led to [plaintiff's] injury."  *Id.* (internal quotations and alterations

omitted).  It is not enough, however, to allege the existence of a policy or custom.  "A plaintiff

must also allege that the policy or custom was the 'proximate cause' of his injuries."  *Estate of*

*Roman*, 914 F.3d at 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir.

1996)).  This can be done "by demonstrating an 'affirmative link' between the policy or custom

and the particular constitutional violation" alleged.  *Id.*  Allegations that simply paraphrase the

standard for municipal liability, are too vague and generalized to support a plausible claim.  *See,*

*e.g.*, *Szerensci v. Shimshock*, No. 20-1296, 2021 WL 4480172, at *7 (W.D. Pa. Sept. 30, 2021)

("Plaintiffs' conclusory allegation, which generally paraphrases the relevant standard, is insufficient to state a claim for § 1983 liability under *Monell*.") (citing cases).

Plaintiffs attribute the development of black mold at CCP to "the old administration's" alleged custom of understaffing and poor enforcement of its safety and health policy. (Compl. at 21.) They assert that the "old guard" had personnel and maintenance policies constituting deliberate indifference due to the state of the HVAC system and the potential for resulting harm to inmates and staff. (*Id*. at 22.) They also refer to a "filtered" grievance process allowing the prison administration to purposefully avoid knowledge of the black mold problem at CCP. (*Id*. at 23.) They allege that, when attempting to clear the mold from the facility, unknown prison officials "did what was quick and easy not what was proper or reasonable for the situation." (*Id*. at 24.) They assert that "[t]he long running failed policys [sic] of the previous administration show a pattern of historical indifference to general maintenance of the facility and safety of staff and inmates in favor of non-adequate, penny-pinching, cost-cutting remedies." (*Id*.) They fault the CCP Maintenance Department and staff for the facility's lack of an effective mold removal process. (*Id*. at 20.)

In short, Plaintiffs assert in turn that the black mold problem at CCP is the result of lack of enforcement of safety and health policies, and also the result of an absence of policies addressing mold removal. However, they do not specify what these policies say or should say. Other than referencing an "old guard," they do not identify any specific official who has put these policies in place or failed to do so. They do not allege that any of the conduct engaged in by the named Defendants happened because of the policies to which they refer. Thus, their allegations fall short of stating a plausible municipal liability claim based on policy.

Plaintiffs also point to historic understaffing as a contributing cause to the black mold problem at CCP.  To the extent the seek to allege a municipal liability claim based on a "custom" of understaffing, they have not done so, because they do not describe how understaffing resulted in the growth of black mold at CCP.

Plaintiffs have not stated a plausible municipal liability claim and the claim will be dismissed.  Because Plaintiffs may be able to assert a plausible claim, they will be granted leave to amend this claim.

### D.    Individual Capacity Civil Rights Claims

#### 1.    Conditions of Confinement Claims

The Court understands Plaintiffs to be asserting claims based on the conditions of their confinement at CCP and the failure of the individual Defendants to successfully remove the black mold at CCP.  The Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  To establish a basis for a Fourteenth Amendment violation, a prisoner must allege that their conditions of confinement amount to punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).  "Unconstitutional punishment typically includes both objective and subjective components."  *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).  "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind."  *Id.* (internal quotations and alterations omitted).

In that regard, "a 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the

restriction is excessive in light of that purpose.'" *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68); *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017). Courts should consider the totality of the circumstances in evaluating such a claim. *Bistrian*, 696 F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution."). Furthermore, "[i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion," courts are obligated to keep in mind that "such considerations are peculiarly within the province and professional expertise of corrections officials." *Stevenson*, 495 F.3d at 68 n.3.

The degree of protection afforded pretrial detainees under the Fourteenth Amendment is greater than that afforded convicted prisoners under the Eighth Amendment. *See Hubbard*, 399 F.3d at 167 n.23. Thus, cases analyzing prisoner conditions of confinement claims are instructive, but only to establish a minimum level of protection available to a pretrial detainee. *See Hall-Wadley v. Maint. Dep't*, 386 F.Supp.3d 512, 517 E.D. Pa. 2019) (dismissing claim based on black mold in shower where pretrial detainee did not allege "actual physical harm from mold.") "The presence of toxic mold in a prison may elicit a violation of the Eighth Amendment, but only if it has posed a substantial risk of serious harm." *Id*. at 518. Thus, the presence of mold without any allegation that it has resulted in harm, does not constitute a violation. *Id*. Additionally, a pretrial detainee cannot state a plausible conditions of confinement claim against a defendant unless that defendant "had actual knowledge [of] or were otherwise aware of the[ ] conditions and acquiesced in their existence/continuation*." Brown v. Berks Cty. Jail*, No. 23-0780, 2023 WL 3324676, at *5 (E.D. Pa. May 0, 2023) (dismissing pretrial detainee's Fourteenth Amendment claim based on presence of black mold where plaintiff

did not allege that specific defendants were aware of the condition and acquiesced in its existence or continuation)

### a.      Mr. Davis's Claim

Mr. Davis alleges that he was exposed to black mold on his mattress and in the vents in his cell, that he advised various CCP personnel of the problem, and that he suffered negative health consequences because of his exposure to mold.  (*See* Compl. at 9-18.)  Mr. Miller also describes the responses he received from various CCP personnel.  He alleges that Defendants Hamb and Sauer observed the mold in his cell and followed up on his complaints by contacting the Maintenance Department about a new mattress.  Defendant Sauer advised Mr. Davis that it would take at least a month to replace the mattress because so many had to be ordered.  (*Id*. at 11.)  Mr. Davis alleges that various other non-Defendant CCP personnel noted the presence of mold in his cell, commented that the situation was unacceptable, and allowed him to take a clean mattress from a different cell.  While Mr. Davis has plausibly alleged that the named Defendants were aware of the condition of which he complains, he has not alleged that they acquiesced in its continuation.  To the contrary, he alleges that they responded to his complaint by seeking to ameliorate the situation.  In these circumstances, Mr. Davis has not plausibly alleged a claim against the only individually named Defendants against whom he asserts his claims and these claims will be dismissed.  Because Mr. Davis may be able to identify other Defendants against whom he can state a plausible claim, he will be granted leave to amend this claim.

### b.      Mr. Miller's Claim

In his Affidavit, Mr. Miller focuses on the effects the failure to enforce policies or develop policies has had on the black mold problem at CCP.  He does not, however, include factual allegations describing his personal experience with exposure to black mold.  For

example, he does not allege when or how he was exposed to mold, whether or to whom he reported a problem and, if so, whether he received a response.  With respect to the consequences of exposure to black mold, Mr. Miller alleges both that "black mold is toxic to everybody," and that, "[w]e have no idea how this airborn[e] spore or toxin will affect us tomorrow or ten years from now."  (*Id*. at 21, 22.)  He does not allege that he has suffered any ill effects from exposure to black mold.

In short, Mr. Miller fails to state a plausible Fourteenth Amendment claim arising from exposure to black mold because his Affidavit does not adequately describe the relevant "who, what, where, when, and how" regarding his exposure to black mold, his efforts (if any) to communicate that a problem existed, or the results of any such communications.  His Affidavit does not "provide enough information to put a defendant on sufficient notice to prepare their defense and also ensure that the Court is sufficiently informed to determine the issue."  *Fabian*, 2017 WL 3494219, at *3.  Recently, in *Wright v. United States*, the United State Court of Appeals for the Third Circuit affirmed the District Court's dismissal with prejudice of a *pro se* amended complaint where the amended complaint failed to assert adequate factual allegations to put the named defendants on notice of the claims against them.  *Id.*, No. 22-1164 (3d Cir., July 14, 2023) (*per curiam*).  The Court of Appeals stated, "[a]s the District Court noted, the second amended complaint lacked factual allegations with respect to many named defendants.  [ ] The balance of defendants has been left to guess the specific factual nature and the legal basis of [the plaintiff's] claims against them, such that they are unable to properly answer or prepare for trial."  *Id.*, slip op. at 6 (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)).

Mr. Miller's claim, to the extent he seeks recovery based on exposure to black mold and the individual Defendants' deliberate indifference to the potential negative health effects of such

exposure, suffers from a similar problem.  He does not allege when he was exposed to black

mold, whether he advised CCP personnel of the presence of the black mold, whether he received

a response to any complaint lodged, or whether he suffered health consequences as a result of the

exposure.  This leaves the Defendants to guess at the nature and basis of Mr. Miller's claims.

Additionally, Mr. Miller's failure to allege harm resulting from exposure to black mold renders

his conditions of confinement claim not plausible as pled.  *See Hall-Wadley*, 386 F. Supp. 3d at

519 (allegations of actual physical harm are required to state Fourteenth Amendment conditions

of confinement claim).

     Mr. Miller's conditions of confinement claims will be dismissed for failure to state a

plausible claim and because they do not comply with Federal Rule of Civil Procedure 8.

Because Mr. Miller may be able to state a plausible claim, he will be permitted to amend his

allegations to "flesh out [their] allegations by . . . explaining in the amended complaint the 'who,

what, where, when and why' of [their] claim."  *See Davis v. IRS*, No. 21-4728, 2022 WL

407639, at *3 (E.D. Pa. Feb. 9, 2022) (citing *Gambrell v. S. Brunswick Bd. of Educ.*, No. 18-

16359, 2019 WL 5212964, at *4 (D.N.J. Oct. 16, 2019)).

### 2.    Supervisory Liability Claims

     Plaintiffs assert claims against current and former CCP Wardens Holland and Phillips,

respectively.  However, there are no allegations in the Complaint describing any conduct

engaged in by these individual or suggesting that these individuals were personally responsible

for the conditions giving rise to Plaintiffs' claims.  As such, Plaintiffs cannot state plausible

claims against them.  *See Rode*, 845 F.2d at 1207.  "Although a court can infer that a defendant

had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a

case, the knowledge must be actual, not constructive."  *Chavarriaga v. N.J. Dep't of Corr.*, 806

F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995); *Rode*, 845 F.2d at 1201 n.6).

To the extent Plaintiffs assert their claims against CCP Wardens Holland and Phillips in their capacity as supervisors, they have not stated plausible claims against these Defendants. Liability under § 1983 cannot be predicated on a *respondeat superior* basis. *Chavarriaga*, 806 F.3d at 227; *Robinson v. Delbalso*, No. 22-2378, slip op. at 3-4 (3d. Cir. Nov. 28, 2022) (*per curiam*). Instead, there are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if they "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). To set forth a claim for supervisory liability under the policy-and-practice strand of supervisory liability, a plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

*Chavarriaga*, 806 F.3d at 227 (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001)). "Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Id.*

As discussed above, although Plaintiffs refer to various policies giving rise to the development of black mold at CCP, they do not specify what those policies were, who put them into place, or who implemented them.  Using a term like "old guard" is insufficient to ascribe personal conduct to a specific defendant.  In particular, they do not identify former Warden Phillips or current Warden Holland as individuals who established or maintained a policy, practice or custom that resulted in Plaintiffs' exposure to black mold.  They also do not attribute to either CCP Wardens Phillips or Holland a failure to implement a particular policy or procedure that would have effectively ameliorated the unreasonable risk associated with exposure to black mold.  They have, therefore, not stated a plausible supervisory liability claim against with CCP Wardens Phillips or Holland on a policy or practice theory.

A supervisor may also "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Id.*  However, generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).[9]

---

[9] Of note, a supervisory prison official's involvement in the grievance process, alone, is not actionable under § 1983.  *See Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."); *Curtis v.*

Plaintiffs do not allege that CCP Wardens Holland or Phillips participated in violating their rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in a subordinate's unconstitutional conduct.  Indeed, as noted, there are no factual allegations in the Complaint describing any conduct engaged in by these Defendants.  The claims against CCP Wardens Holland and Phillips are not plausible and will be dismissed without prejudice.  Plaintiffs will be granted leave to amend these claims.

### E.   Claims Pursuant to the Americans with Disabilities Act

Plaintiffs assert a claim under the ADA.  (Compl. at 8.)  To allege a plausible violation of Title II of the ADA, a plaintiff must assert that (1) they are a "qualified individual with a disability;" (2) they are being excluded from participation in or being denied the benefits of some "services, programs, or activities," by reason of their disability; and (3) the entity which provides the service, program or activity is a public entity.  *See, e.g., Layton v. Elder*, 143 F.3d 469, 472 (8th Cir.1998); *Bowers v. NCAA*, 9 F. Supp. 2d 460, 475 (D.N.J. 1998); *Adelman v. Dunmire*, No. 95-4039, 1997 WL 164240 (E.D. Pa. Mar. 28, 1997).  The United States Supreme Court has held that Title II of the ADA applies to state prisons and inmates.  *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998) (noting the phrase "services, programs, or activities"

---

*Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants [Superintendent] Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue].").  *See also Robinson v. Delbalso*, No. 22-2378, slip op. at 4 (3d Cir. Nov. 28, 2022) (*per curiam*) ("Contrary to Robinson's assertions, awareness of a grievance or complaint after the allegedly unconstitutional conduct has occurred, without more, is insufficient to establish personal involvement.").  Plaintiffs' Complaint, and Mr. Davis's allegations in particular, reference filing grievances and the related conduct of some of the named Defendants.  There are, however, no allegations describing the participation, if any, of CCP Wardens Holland or Phillips in the grievance process.  It is not clear from the Complaint whether Plaintiffs seek to pursue claims based on the grievance process.  They will be afforded an opportunity to clarify their intent on amendment.

includes recreational, medical, educational, and vocational prison programs). The proper

defendant under a Title II claim is the public entity (such as Chester County) or an official acting

in his official capacity.[10] *See Emerson v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002).

Therefore, as an initial matter, individual-capacity ADA claims against the individual

Defendants must be dismissed because they are not "public entities" within the meaning of the

ADA.

 To be considered a "qualified individual with a disability" under the statute, a plaintiff

must allege that he has a "disability" which is defined as "a physical or mental impairment that

substantially limits one or more major life activities of such individual." 42 U.S.C. §

12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself,

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

*Id*. at § 12102(2)(A). The Supreme Court has construed the term "substantial" to preclude

"impairments that interfere in only a minor way" with a major life activity and the term "major

life activities" to refer "to those activities that are of central importance to daily life." *Toyota

Motor Mfg. v. Williams*, 534 U.S. 184, 196-97 (2002); *see also* 28 C.F.R. § 35.108. Therefore,

"merely having an impairment does not make one disabled for purposes of the ADA." *Id.* at 195.

 Monetary damages, such as those sought by Plaintiffs, are not available under the ADA

absent a showing of intentional discrimination. *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir.

2018)). "To prove intentional discrimination, an ADA claimant must prove at least deliberate

---

 [10] To the extent Plaintiffs are suing the named Defendants in their official capacities, the Supreme Court has held that Title II of the ADA "validly abrogates state sovereign immunity" for "conduct that actually violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006).

indifference, and to plead deliberate indifference, a claimant must allege (1) knowledge that a federally protected right is substantially likely to be violated and (2) failure to act despite that knowledge." *Id.* (internal citation and ellipses deleted).  A plaintiff can plead deliberate indifference in two ways: "first, by alleging facts suggesting that the existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like the plaintiffs,' or, second, by alleging facts indicating that [plaintiff] could prove that the risk of cognizable harm was so great and so obvious that the risk and the failure to respond will alone support finding deliberate indifference." *Id.* (internal quotation marks and ellipses deleted).

The Complaint includes no allegation that either of the Plaintiffs is disabled within the meaning of the ADA, and the Complaint does not include allegations suggesting that the Plaintiffs have been excluded from participation in or been denied the benefits of "services, programs, or activities," by reason of a disability.  Even construed liberally, the Complaint does not provide factual allegations sufficient to support an ADA claim, and these claims will be dismissed.  Because Plaintiffs may be able to state plausible ADA claims, the claims will be dismissed without prejudice and Plaintiffs will be granted leave to amend.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Mr. Miller and Mr. Davis leave to proceed in forma pauperis and dismiss with prejudice their claims against CCP, its Maintenance Department, the Chester County Health Department, and the Chester County District Attorneys' Office.  Plaintiffs' individual capacity claims arising from their ADA claims will also be dismissed with prejudice.  Plaintiffs' official capacity civil rights claims against the individual Defendants will be dismissed as duplicative of the claims against Chester County.  Plaintiffs' remaining claims will be dismissed without prejudice for failure to state a claim pursuant to 28

U.S.C. § 1915(e)(2)(B)(ii).  Plaintiffs will be granted leave to file an amended complaint.  The

Chester County District Attorney's Office's motion to dismiss will be denied as moot.